**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTOINE B.,[1]** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | **No. 23 C 5634** |
| | **)** | |
| v. | **)** | **Magistrate Judge Jeffrey Cole** |
| | **)** | |
| **MARTIN J. O'MALLEY,** | **)** | |
| **Commissioner of Social Security,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381a, 1382c, about three years ago in January 2021. (Administrative Record (R.) 295-312). He claimed that he had been disabled since January 14, 2020 (R. 310, 312) due to "Spinal Cord Injury, Cervical Spinal Cord Injury, Middle Finger Amputation on Left Hand, Index Finger and Middle Finger Amputation on Right Hand, Macular Degeneration, Vitreous Hemorrhage in Right Eye, Corneal Scarring in Right Eye." (R. 309). Over the next two and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the most recent ALJ's decision that is before the court for review. *See* 20 C.F.R. §§ 404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) back on August 17, 2023, and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

December 6, 2023. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**

After two administrative hearings at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: status post amputation of middle finger of the left hand; status post amputations of the index finger and middle finger of the right hand; low vision status post vitreous hemorrhage and corneal scarring of the right eye; status post heart attack; as well as mild-to-moderate degenerative changes of the cervical and lumbar spine. (R. 27). The ALJ found that, although the plaintiff had a number of other impairments, these caused only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to meet the basic demands of work activity. (R. 27). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listings 1.15 (Disorders of the skeletal spine resulting in compromise of a nerve root(s)), 1.16 (Lumbar spinal stenosis resulting in compromise of the cauda equina) 1.18 (Abnormality of a major joint(s) in any extremity), 1.20 (Amputation due to any cause), 1.21 (Soft tissue injury or abnormality under continuing surgical management), 2.02 (Impairment of Visual Acuity), 2.03(Contraction of visual field), 2.04 (loss of visual efficiency), 4.02, and 4.10 (Aneurysm of aorta or major branches, due to any cause). (R. 30-31).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to capacity to perform light work with the following exceptions: cannot climb ladders, ropes, or

scaffolds, as well as work at unprotected heights; cannot work with hazardous machinery or drive

a motor vehicle; can occasionally climb ramps, climb stairs, and crouch; frequently stoop and kneel;

frequently handle and finger with the bilateral upper extremities; and the individual has no vision

in the right eye so all work should be in front of the individual and not coming into his field of vision

from the right. (R. 31-32). The ALJ then summarized the plaintiff's allegations, noting that the

plaintiff testified that he experienced persistent joint pain, shortness of breath, easy exertion with

physical activity, weakness, fatigue, severe vision loss, as well as widespread loss mobility or

functionality in his back and extremities. The plaintiff also said he cannot lift more than five pounds

or perform sustained gross motor and manipulative tasks with the bilateral upper extremities; could

not walk farther than one block, or stand or sit for extended periods before needing to switch

positions. The plaintiff testified that he spends most of his day lying down and resting for basic

symptom relief. He also said that he cannot adequately complete basic daily tasks and can no longer

engage in fulltime work activities. (R. 32). The ALJ then found that while the plaintiff's "medically

determinable impairments could reasonably be expected to cause the alleged symptoms, . . . the

[plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms

are not entirely consistent with the medical evidence and other evidence in the record for the reasons

explained in this decision." (R. 32).

The ALJ then discussed the medical record, beginning with the plaintiff's treatment at the

emergency room following a car accident in January 2020. Radiographic studies of the cervical

spine revealed, "Mild osteoarthritis of mid cervical spine disc spaces in particular," but there was

normal vertebral alignment with no evidence of fractures, compression deformity, destructive lesion,

or soft tissue abnormality. X-rays of the lumbar spine did not reveal acute or longstanding

pathologies. Upon examination, there was "mild to moderate cervical paravertebral spasm on the right and left side of the posterior neck," but normal strength, range of motion, reflexes, sensation, and overall appropriate musculoskeletal and neurologic functioning less than 24 hours after his injury.

The ALJ went on to note that a cervical spine MRI in March 2020 revealed a circumferential disc bulge with posterior herniation causing mild foraminal and central canal stenosis at C4-C5; a circumferential disc bulge with posterior herniation causing moderate foraminal and central canal stenosis at C5-C6; and multilevel spondylosis with associated disc bulges. MRI of the lumbar spine from March 2020 demonstrated multilevel spondylosis of facet arthrosis and ligamentum flavum hypertrophy; annular bulge at L4-5 causing moderate foraminal and mild central canal stenosis; and annular bulges at L3-4 and L5-S1. A December 2020 CT of the cervical spine was normal, with the exception of mild disc bulges particularly at the level of C2-C3, C3-C4, and a milder disc bulge at C4-C5. (R. 33). The ALJ then noted that plaintiff had bilateral C5-T1 facet joint injections on June 22, 2020, bilateral C5-C8 medial branch block on July 27, 2020, bilateral L3-S1 facet joint injections on October 12, 2020, bilateral L2-L5 medial branch block on January 4, 2021, and a bilateral L2-L5 lumbar radiofrequency ablation on February 8, 2021. Plaintiff also underwent physical therapy and chiropractic treatment. (R. 33-34).

Unfortunately, the plaintiff was attacked during a robbery in November 2020 and was hospitalized for ten days. (R. 34-35). The ALJ noted that the plaintiff denied back pain while receiving in-patient medical attention in December 2020 for the injuries sustained during that attack. After February 2021, the ALJ said that the medical record discusses plaintiff's history of paraspinal injury sparingly. The plaintiff's medical providers generally observed that he had normal or only

4

slightly diminished strength, range of motion, or overall neurologic and musculoskeletal functioning. (R.34).

The ALJ then took a brief detour from the medical evidence to relate that in function reports in February 2021 and April 2021, the plaintiff claimed he had significant physical limitations and difficulties performing activities of daily living, but those seemed to stem from his vision loss or bilateral hand impairments. In his most recent function report, the plaintiff said that he was generally capable of completing personal care tasks, preparing simple meals, such as frozen dinners and sandwiches, and performing light household chores, such as taking out the trash and laundry. He also said he could travel independently by walking or public transportation, and that he goes to the post office as well as the grocery store to shop for food and essential items on a regular basis. (R. 34).

From there, the ALJ circled back to the medical record. She noted that, in June 2022, the plaintiff told his doctor that "he ha[d] been feeling well since discharge. No dyspnea, abdominal pain, leg swelling, or physical limitations. He reports taking his medication as prescribed." The plaintiff also was able to walk "1280 feet [without symptoms]." The ALJ then noted that "[d]espite minimal discussion of upper or lower back symptoms in his recent treatment encounters, the [plaintiff] testified that he still experiences discomfort in those areas." The ALJ explained that she found that the plaintiff could not climb ladders, ropes, or scaffolds but retain[ed] the ability to perform all other postural activities at least occasionally "in an abundance of caution." (R. 34).

Next, the ALJ discussed the injuries the plaintiff sustained to his hands in the November 2020 attack. The record indicated that plaintiff suffered "...crush injuries to the bilateral hands; he presents with severe infection and necrotizing fasciitis of bilateral hands who presents for incision

and drainage" Plaintiff had to undergo multiple surgical procedures in December 2020 that ultimately resulted in the amputation to the middle finger of his left hand as well as amputations to the index finger and middle finger of his right hand. The plaintiff attended four post-operative follow-up encounters in January 2021 through February 2021. The ALJ said that despite the severity of his bilateral hand injuries and the intensive nature of his treatment in December 2020, the medical evidence of record after January 2021 discusses these issues sparingly. The most recent post-operative examination showed the incisions to be well-healed, with minimal swelling of hands, some scar tissue, and sensitivity to palpation. There was no erythema, fluctuance, drainage or other evidence of infection, and there was good range of motion of the digits with neurovascular status intact. Plaintiff was advised to work on scar tissue massage and range of motion exercises. (R. 35).

Returning to the plaintiff's February 2021 and April 2021 function reports, the ALJ noted that the plaintiff said he was generally capable of completing personal care tasks, preparing simple meals, such as frozen dinners and sandwiches, and performing light household chores, such as taking out the trash and laundry. Again, the ALJ related that the plaintiff travels independently by walking or public transportation, and that he goes to the post office as well as the grocery store to shop for food and essential items on a regular basis. The ALJ said the plaintiff can test and send emails, but it takes him a longer time due to the loss of fingers which also limited his ability to hold coins and prevent him from driving and playing sports. The AL felt that this demonstrated plaintiff could frequently handle and finger with the bilateral upper extremities. (R. 35).

The ALJ then acknowledged that, as a result of the November 2020 assault, plaintiff suffered trauma to his face and especially to his right eye. Plaintiff was diagnosed with vitreous hemorrhage and corneal scarring for which he underwent right vitreo-retinal surgery on January 28, 2021.

Nevertheless, he had significant right eye vision loss.  (R. 35-36).  A consultative eye exam in October 2021, revealed significant trauma to the right eye, including a dense corneal scar, traumatic optic neuropathy, and a macular hole. Plaintiff required eyeglasses for the left eye. (R.36).  Plaintiff reported that he was unable to drive due to his vision deficits.  Because the plaintiff said he was nevertheless able to complete personal care tasks and light household chores, prepare simple meals, and travel independently via walking or public transportation, the ALJ felt plaintiff's "work should be in front of him and not coming into his field of vision from the right."  The ALJ added that, even though the plaintiff retained good left eye vision, he should be restricted from work at unprotected heights, work with hazardous machinery, or driving a motor vehicle. (R. 36).

From there, the ALJ moved on to consider evidence relating to a heart attack the plaintiff suffered in May 2022. Plaintiff was hospitalized and underwent a variety of clinical studies and evaluations, the results of which revealed that he was experiencing congestive heart failure with a severely reduced ejection fraction of 25 percent and ST elevation myocardial infarction.  The plaintiff was hospitalized for nine days, during which he received constant medical monitoring as well as medication management, notably anticoagulant therapy.  Plaintiff was discharged in stable condition with advice to begin treatment with a cardiologist, start monitoring his weight and diet, and adhere to his newly established prescription medication regimen. (R. 36).  A week after discharge, plaintiff reported he had been feeling well since, and had no complaints of dyspnea, abdominal pain, leg swelling, or physical limitations. (R. 36).  Examination revealed appropriate cardiovascular, respiratory, gastrointestinal, and peripheral-vascular functioning, and the plaintiff underwent a six-minute walk test and "walked 1280 feet without symptoms. (R. 36-37).  The ALJ noted that plaintiff had no cardiovasular or pulmonary issues prior to the heart attack and, as such,

limited plaintiff to performing work activities at the light exertion level in which he should avoid concentrated use or exposure to moving machinery and unprotected heights. (R.37).

The ALJ then considered the medical opinions. She found cursory statements offered by the plaintiff's treatment providers concerning his physical functioning unpersuasive. The ALJ explained that none of the treatment providers offered a function-by-function assessment of the plaintiff's ability to perform physical or mental work activities for the period of alleged disability, but were conclusory "return to work" statements. The ALJ further explained that opinions of this nature may provide evidence of the severity of the plaintiff's impairments but the ultimate determination of disability is an issue reserved for the Commissioner of Social Security. The ALJ added that the statements were focused on a specific period of time that occurred early in the claimant's period of alleged disability – many before June 2020 – and gave no indication they were meant to serve as a permanent statement regarding the plaintiff's ability to perform physical work activities. Finally, the ALJ said the statements were far too cursory and vague in nature and offered little insight into the plaintiff's residual functional capacity for the entire period of alleged disability. (R. 37).

The ALJ also found that the opinions from the state agency reviewing physicians were not persuasive. The ALJ noted that, at the initial level, Dr. Leong determined that the plaintiff could perform work activities at the medium exertion level with frequent bilateral handling and feeling, and that the plaintiff's right macular degeneration did not satisfy the durational and substantive requirements of a severe impairment. The ALJ said that Dr. Leong did not adequately consider the combined effect of the plaintiff's physical conditions, and did not have access to the medical evidence of record in its entirety, especially that concerning the claimant's ophthalmology treatment. As a result, Dr. Leong could not adequately address the combined or lingering effect of the

claimant's physical impairments and associated symptoms for the entire period of alleged disability. (R. 38).

At the reconsideration level, Dr. Jhaveri determined that the plaintiff could perform work activities at the medium exertion level but could only frequently handle and finger with the bilateral upper extremities as well as should avoid concentrated exposure to workplace hazards secondary to right eye vision loss. The ALJ noted that Dr. Jhaveri was a medical specialist, that he thoroughly reviewed the bulk of the available medical evidence in the record, and hat he had an understanding of social security disability programs and evidentiary requirements. On the other hand, that ALJ noted that Dr. Jhaveri he did not have the opportunity to perform an in-person physical examination of the plaintiff, review more recent treatment records, or listen to the plaintiff's testimony at the hearing. The ALJ felt that, as a result, the doctor greatly overestimated the plaintiff's physical capabilities. (R. 37). Otherwise, Dr. Jhaveri provided opinions that were generally consistent with the medical evidence of record as a whole, which the ALJ said ultimately failed to show disabling physical pathologies. (R. 38).

Relying on the vocational expert's testimony, the ALJ then found that the plaintiff's residual functional capacity would not allow him to perform his past relevant work as an industrial cleaner or hospital cleaner, which was medium or heavy work. (R. 38-39). But, further relying on the vocational expert's testimony, the ALJ detarmined that there were other jobs that existed in significant number in the national economy that plaintiff could perform. Examples of those were: Housekeeping Cleaner (DOT#323.687-014, light work, 120,000 jobs); Garment Sorter (DOT#222.687-014, light work, 23,000 jobs); and Mail Clerk (DOT#209.687-026, light work, 25,000 jobs). (R. 39-40). Accordingly, the ALJ concluded that the plaintiff was not disabled and not

entitled to benefits under the Act. (R. 40).

## II.

A court's review of an ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The substantial evidence standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within

which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Warnell v. O'Malley*, 97 F.4th 1050, 1054 (7th Cir. 2024) ("All we require is that ALJs provide an explanation for how the evidence leads to their conclusions that is "'sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the appellant] meaningful judicial review.'"); *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record.");

*Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. But, the Seventh Circuit has also called this requirement "lax." *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). Indeed, recently the Seventh Circuit "emphasized that social-security adjudicators are subject to only the most minimal of articulation requirements." *Warnell*, 97 F.4th at 1053. As ever, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[23]

---

[2] Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which

(continued...)

_____

[2](...continued)
must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).

The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted).

[3] On April 8, 2024, in *Warnell v. O'Malley*, 94 F.4th 1050 (7th Cir. 2024), the Seventh Circuit emphasized that its use of the phrase, "logical bridge," was never intended an independent doctrine or "test" to be slavishly and independently employed by courts in reviewing Social Security cases:

Time and time again, we have emphasized that social-security adjudicators are subject to only the most minimal of articulation requirements. An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning. ...All we require is that ALJs provide an explanation for how the evidence leads to their conclusions that is 'sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the appellant] meaningful judicial review.'...At times, we have put this in the shorthand terms of saying an ALJ needs to provide a 'logical bridge from the evidence to his conclusion.'

*Warnell*, 94 F.4th at 1053-54. Immediately thereafter, the Court said:

The ALJ here provided a more than sufficient explanation for why the medical record led her to deny Warnell's claim. The judge devoted considerable space to addressing the persuasiveness of Warnell's experts. She highlighted specific evidence that contradicted their conclusions, going so far as to cite and describe discrete examination findings. The ALJ also acknowledged and grappled with conflicting evidence, ultimately concluding that the treatment record as a whole supports a finding of non-disability. The law required no more of the ALJ, so we AFFIRM.

(continued...)

Nevertheless, in this instance, the ALJ has not done enough to warrant affirmance of his decision.

## III.

The plaintiff raises a handful of arguments for overturning the ALJ's decision in this case. First, the plaintiff submits that the ALJ failed to assess evidence from an agency expert that plaintiff had restricted near and far acuity, depth perception, accommodation, color vision, and field of vision. Second, the plaintiff contends that the ALJ went beyond her qualifications when she interpreted lumbar and cervical spine imaging as consistent with light work. Third, the plaintiff argues that the ALJ failed to provide a "logical bridge" from the evidence of plaintiff's hand injuries including finger amputations to the finding that plaintiff could frequently handle and finger with no additional manipulative limits. Fourth, the plaintiff asserts that the ALJ failed to properly evaluate the plaintiff's symptoms. Any other arguments the plaintiff might have raised are deemed waived. *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022)("Arguments not raised in the district court are waived."); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020)("... arguments omitted before the district court are [waived].").

## A.

We begin with the plaintiff's second argument. On March 2, 2020, not long after his motor vehicle accident, the plaintiff had MRIs of his cervical and lumbar spines, which revealed disc

---

[3](...continued)
*Id.* at 54.

*Warnell* constitutes a clear rejection of the unfortunate "'tendency [in the law] whereby phrases are made to do service for critical analysis by being turned into dogma.'" *Pennekamp v. Florida*, 328 U.S. 331, 352 (1946)(Frankfurter, J., concurring).

14

bulges at multiple levels, along with mild to moderate central canal stenosis. More specifically, the lumbar spine MRI showed multilevel spondylosis of facet arthrosis and ligamentum flavum hypertrophy, annular bulge at L4-5 causing moderate foraminal and mild central canal stenosis, and annular bulges at L3-4 and L5-S1. (R. 1171-73, 1241-42). The cervical spine MRI showed a circumferential disc bulge at C4-5 with posterior herniation causing mild foraminal and central canal stenosis, a circumferential disc bulge at C5-6 with posterior herniation causing moderate foraminal and central canal stenosis, and multilevel spondylosis with associated disc bulges. (R. 1174-76, 1239-40). While the ALJ acknowledged these findings, she seemingly found a later study, a CT taken December 2, 2020, trumped those results:

> However, the claimant's computer tomography ("CT") studies of the cervical spine taken in December 2020 demonstrated more modest pathologies: "Visualized portion of the cervical spine is otherwise normal with exception of mild disc bulges particularly at the level of C2-C3, C3-C4 and milder at C4-C5" (9F/50).

(R. 33). There are two or three problems with the ALJ's observations.

First, the ALJ was out of her element making a medical judgement regarding the earlier and later studies. ALJs have to be careful not to "play doctor" and offer their own lay interpretations of medical studies. That's what the ALJ did here in expressing a preference for the December 2020 study over the March 2020 studies. *See, e.g., Bakke*, 62 F.4th 1061, 1067 n.2 (7th Cir. 2023)(ALJ properly deferred to medical professionals rather than independently evaluating study results); *Durham v. Kijakazi*, 53 F.4th 1089, 1094–95 (7th Cir. 2022)(an ALJ may not interpret tests on his own); *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018)(remand where "ALJ impermissibly assessed the MRI report on his own without the assistance of a medical expert."); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ALJ erred in failing to submit MRI in to medical scrutiny and in

15

interpreting results herself).

Here, no state agency reviewing physician had the opportunity to consider the March 2022 studies. (R. 112-15, 120-122, 132-33, 138-40, 146-47, 150-51, 155-56, 159-60). All they had were January 2020 x-rays of the lumbar and cervical spine, which showed no more than mild arthritic changes. (R. 121, 139, 151, 160). A later study that shows mild to moderate disc bulges at multiple levels of the cervical and lumbar spines, along with foraminal and central canal stenosis, represents a significant departure from the evidence the state agency physicians were looking at. *See, e.g., Baptist v. Kijakazi*, 74 F.4th 437, 442 (7th Cir. 2023)("It is well-established that ALJs may not rely on a state agency consultant's assessment if later evidence 'reasonably could have changed' the opinion."); *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018).

And, significantly, what the reviewing physicians said about the December 2020 CT of the plaintiff's cervical spine underscores that the ALJ was overstepping her bounds by interpreting it: they didn't say anything. That's because the study was not done of the plaintiff's cervical spine; it was done of his eye sockets, face, and skull due to injuries he suffered in the attack. The study is clearly labeled "EXAM: CT ORBITS W CONTRAST, CT FACIAL BONES WO CONTRAST." (R. 855, 873-74). The reviewing doctors acknowledge this, calling it "IMAGING CT ORBITS W CONTRAST.' (R. 113, 156, 159). The study took in some of the cervical spine, but only peripherally. Obviously, a study that focuses on the cervical spine is going to be more reliable to physicians analyzing a cervical spine issue than a study that focuses on something else. *Cf. Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995)("The medical records were of purely physical ailments for which [plaintiff] had sought help, and there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression."). Wisely, none

of the reviewing physicians refers to those results. The fact that the ALJ was dismissing an actual cervical spine study – not to mention a lumbar spine study – in favor of a study of the plaintiff's orbital and facial bones makes the ALJ's error more apparent. And, more "remandable."

The Commissioner complains that there is an element of sandbagging to the plaintiff's submission of the March 2020 cervical and lumbar spine studies because an August 2022 letter from plaintiff's counsel indicated that reports from Advanced Physical medicine were not submitted until April 22, 2022. [Dkt. #22, at 9]. The Commissioner says that the "disputed" MRIs are found in Exhibit 15F (Tr. 1239-40, 1241-42) and that Exhibit 15F contains the only records from Advanced Physical Medicine. [Dkt. #22, at 9 n.1]. But, the March 2020 studies are from Archer Open MRI and are also found in Exhibit 14F (R. 1171-76), neither of which is mentioned in counsel's August 2022 letter. (R. 430). In any event, let's say that the MRI reports came in after the state agency physicians completed their review. That wouldn't change the fact that the ALJ determined on her own that the CT of plaintiff's eye sockets and face said more about the condition of the plaintiff's spine than actual studies focusing on the plaintiff's cervical and lumbar spine. And so, it wouldn't change the fact that the ALJ overstepped her bounds requiring that this case has to be remanded.

**B.**

While the ALJ's preference for the CT of plaintiff's facial bones over MRIs of plaintiff's cervical and lumbar spines to show the condition of plaintiff's cervical spine requires a remand, one or two more comments are in order.

It is one thing to say, as the ALJ did: "status post amputation of middle finger of the left hand; status post amputations of the index finger and middle finger of the right hand." But it is another to look at the blurry images of plaintiff's hands (R. 46-53), especially plaintiff's dominant

right hand (R. 60, 72) and conclude, "those look like hands that can frequently manipulate objects five days a week, fifty or so weeks a year." Remember, "frequently" means one-third to two-thirds of the day. SSR 83-10, 1983 WL 31251, at *6. As the plaintiff rather accurately described at his hearing, his right hand is missing not only the first and second fingers, but a portion of the palm. (R. 66-67, 627). It is, essentially, an "L." (R. 73-74). He said – and it is not difficult to believe – that he can no longer do things he used to do on his former job like wring out a mop. (R. 66). It's tough to see how, then, he could be a housekeeping cleaner, which is one of the jobs the ALJ said he can do.

Or a garment sorter. Taking a look at "Garment Sorter" in the Dictionary of Occupational Titles, dexterity and manipulation are the buzz words of the occupation:

ABILITIES:
Abilities elements are ranked by importance.

80 Manual Dexterity
The ability to quickly make coordinated movements of one hand, a hand together with its arm, or two hands to grasp, manipulate, or assemble objects

75 Finger Dexterity
The ability to make precisely coordinated movements of the fingers of one or both hands to grasp, manipulate, or assemble very small objects

WORK ACTIVITIES:
Work activities elements are ranked by importance.

92 Handling and Moving Objects
Using one's own hands and arms in handling, installing, forming, positioning, and moving materials, or in manipulating things, including the use of keyboards.

90 (F) Using Hands on Objects, Tools, Controls
How much time in a usual work period does the worker spend: Using hands to handle, control, or feel objects, tools or controls?

https://occupationalinfo.org/onet/93998.html. The same can be said of mail clerk. "Wrist-Finger"

18

speed rates a 70 out of 100 in Abilities, "Handling and Moving Objects" and "Using Hands on Objects, Tools, Controls" rate an 83 and a 75 in Work Activities. https://occupationalinfo.org/onet/57302.html. [4]

The Commissioner argues that the ALJ properly relied on the opinions from the state agency reviewing physicians to reach her conclusion that the plaintiff, with his severely damaged dominant hand, could manipulate objects up to about six hours every day. [Dkt. #22, at 10]. But, as the Commissioner has to concede, the ALJ found the opinions from those two doctors "unpersuasive." One of them, at least, had "greatly overestimated" the plaintiff's physical capabilities. (R. 37-38). In essence, the Commissioner and the ALJ want the court to believe that the two doctors were wrong about some aspects of the plaintiff's abilities because they hadn't examined the plaintiff or reviewed the entire record, but those same drawbacks did not adversely affect their view of plaintiff's manipulative abilities. Given the medical record and the plaintiff's testimony regarding his hands, that's a tough sell.

## C.

The plaintiff was born on February 6, 1971, and so was 51 years old at the time the ALJ found he was not disabled. He has a very good work record as a janitor or hospital cleaner since 2006 (R. 315-16 353-56), and from 1989 through 1999 prior to that. (R. 314-15). While not dispositive, "a consistent work history weighs in favor of a positive credibility finding." *Summers*

---

[4] While we are at it, "Mail Clerk" seems like a tough ask for someone who is blind in one eye. The most important abilities for the work are Perceptual Speed (80--The ability to quickly and accurately compare letters, numbers, objects, pictures, or patterns. The things to be compared may be presented at the same time or one after the other. This ability also includes comparing a presented object with a remembered object); and Near Vision (75– The ability to see details of objects at a close range (within a few feet of the observer)). https://occupationalinfo.org/onet/57302.html.

*v. Berrhill*, 864 F.3d 523, 529 (7th Cir. 2017). *See also Cole v. Colvin*, 831 F.3d 411, 415 (7th Cir. 2016)(". . . we have said that 'a claimant with a good work record is entitled to [a finding of] substantial credibility when claiming an inability to work because of a disability.'"); *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015)(". . . a 'claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.'"). The plaintiff probably would still be doing so had he not had about a year and a half's worth of horrible luck. As the Commissioner concedes, the plaintiff has required a lot of medical treatment in a fairly brief span of time.

A motor vehicle accident in January 2020 either left him with, or worsened, multiple bulging discs and stenosis in his cervical and lumbar spines. The pain was severe enough that his doctors gave him a course of bilateral medial branch blocks, facet joint injections, radiofrequency ablations. (R. 1288, 1309, 1330, 1350). Later that same year, he suffered a brutal attack. It resulted in severe injuries to his face and hands that left him with vision in just one eye and the loss of two fingers and part of his palm on one hand and one finger on the other. And just a few months after that, he had a heart attack.

That's a lot, and it is definitely not intuitive that such an individual could go back to work performing the tasks the ALJ said plaintiff could, day after day. This is the kind of record where an ALJ has to go a bit further in fashioning a logical bridge from the evidence to her conclusion. It's the kind of record where an ALJ can't just dismiss MRIs of the cervical and lumbar spine revealing multiple bulging discs in favor of a CT of the face where those issues didn't show up. It's the kind of record where an ALJ can't just say the plaintiff can perform frequent handling and call the only opinions that suggest that's possible "unpersuasive." It's the kind of a record where an ALJ's logical

bridge has to be more akin to something like the Mackinac Bridge than the far less substantial structure that the ALJ provided.

## CONCLUSION

For the foregoing reasons, the plaintiff's request that the ALJ's decision be remanded [Dkt. #16] is granted, and the defendant's motion for summary judgement [Dkt. #21] is denied.

ENTERED: _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 6/4/24